Query Reports Utilities Help Log Out

ACCO,E-FILED RELATED CASE,(PVCx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:26-cv-04052-JFW-PVC

Malm, Inc. v. CoStar Group, Inc., et al
Assigned to: Judge John F. Walter
Referred to: Magistrate Judge Pedro V. Castillo
Cause: 28:1337 Sherman-Clayton Act

Date Filed: 04/15/2026
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Malm, Inc.**
*individually and on behalf of all others similarly situated*

represented by

**Halley Wilder Josephs**
Susman Godfrey LLP
1900 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
310-789-3100
Email: hjosephs@susmangodfrey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy Gradwohl**
Berger Montague, PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
215-875-3000
Email: jgradwohl@bergermontague.com
*(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew C Curley**
Berger Montague PC
1818 Market Street Suite 3600
Philadelphia, PA 19103
215-875-3050
Fax: 215-875-4604
Email: acurley@bergermontague.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brandon Michael Baum-Zepeda**
Edelson PC
1255 Union Street NE, Suite 850
Washington, DC 20002
202-270-4777
Email: bbaum-zepeda@edelson.com
*ATTORNEY TO BE NOTICED*

**Henry J. Walter**
Susman Godfrey LLP
One Manhattan West
50th Floor
New York, NY 10001
212-729-2072
Email: hwalter@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia McGrath**
Berger Montague PC
1818 Market Street Suite 3600
Philadelphia, PA 19103
215-875-4675
Fax: 215-875-4604
Email: jmcgrath@bergermontague.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Natasha J. Fernandez-Silber**
Edelson PC
200 South 1st Street
Ann Arbor, MI 48104
312-589-6370
Fax: 213-947-4251
Email: nfernandezsilber@edelson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah R Lafreniere**
Edelson PC
1255 Union Street NE, Ste 850
Washington, DC 20002
202-270-4777
Email: slafreniere@edelson.com
*ATTORNEY TO BE NOTICED*

**Shawn J Rabin**
Susman Godfrey LLP
One Manhattan West, 50th Floor
New York, NY 10001
212-336-8330
Fax: 212-336-8340
Email: srabin@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William C Carmody**
Susman Godfrey LLP
One Manhattan West
395 9th Avenue 50th Floor
New York, NY 10001
212-336-4330

Fax: 212-336-8334
Email: bcarmody@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary D Caplan**
Berger Montague PC
1818 Market Street Suite PC
Philadelphia, PA 19103
215-875-3000
Fax: 215-875-4604
Email: zcaplan@bergermontague.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CoStar Group, Inc.**

represented by

**Elyse Miriam Greenwald**
Latham and Watkins LLP
10250 Constellation Boulevard Suite 1100
Los Angeles, CA 90067
424-653-5500
Fax: 424-653-5501
Email: elyse.greenwald@lw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah A. Tomkowiak**
Latham and Watkins LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
202-637-2200
Fax: 202-637-2201
Email: sarah.tomkowiak@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Costar Realty Information, Inc.**

represented by

**Elyse Miriam Greenwald**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah A. Tomkowiak**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/15/2026 | 1 | COMPLAINT Receipt No: BCACDC-42013368 - Fee: $405, filed by Plaintiff MALM, INC.. (Attorney Halley Wilder Josephs added to party MALM, INC.(pty:pla))(Josephs, |

| | | |
|---|---|---|
| | | Halley) (Entered: 04/15/2026) |
| 04/15/2026 | 2 | CIVIL COVER SHEET filed by Plaintiff MALM, INC.. (Josephs, Halley) (Entered: 04/15/2026) |
| 04/15/2026 | 3 | NOTICE of Interested Parties filed by Plaintiff MALM, INC., (Josephs, Halley) (Entered: 04/15/2026) |
| 04/15/2026 | 4 | NOTICE of Related Case(s) filed by Plaintiff MALM, INC.. Related Case(s): 2:20-cv-08819-CBM-AS (Josephs, Halley) (Entered: 04/15/2026) |
| 04/15/2026 | 5 | Notice of Pendency of Other Actions filed by Plaintiff MALM, INC.. (Josephs, Halley) (Entered: 04/15/2026) |
| 04/15/2026 | 6 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff MALM, INC.. (Josephs, Halley) (Entered: 04/15/2026) |
| 04/23/2026 | 7 | NOTICE OF ASSIGNMENT to District Judge John F. Walter and Magistrate Judge Pedro V. Castillo. (ghap) (Entered: 04/23/2026) |
| 04/23/2026 | 8 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 04/23/2026) |
| 04/23/2026 | 9 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (ghap) (Entered: 04/23/2026) |
| 04/23/2026 | 10 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendants CoStar Group, Inc., Costar Realty Information, Inc. (ghap) (Entered: 04/23/2026) |
| 04/24/2026 | 11 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney William C Carmody on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 12 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Shawn J Rabin on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 13 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Henry J Walter on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of |

| | | |
|---|---|---|
| | | record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 14 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Andrew C Curley on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 15 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Zachary D Caplan on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 16 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Julia McGrath on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 17 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Natasha J Fernandez-Silber on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 18 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Sarah R Lafreniere on behalf of Plaintiff. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as |

| | | |
|---|---|---|
| | | counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 04/24/2026) |
| 04/24/2026 | 19 | STANDING ORDER by Judge John F. Walter. READ THIS ORDER CAREFULLY. IT CONTROLS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES. This action has been assigned to the calendar of Judge John F. Walter. (iv) (Entered: 04/24/2026) |
| 04/27/2026 | 20 | Notice of Appearance or Withdrawal of Counsel: for attorney Jeremy Gradwohl counsel for Plaintiff Malm, Inc.. Adding Jeremy Gradwohl as counsel of record for Malm, Inc. for the reason indicated in the G-123 Notice. Filed by Plaintiff Jeremy Gradwohl. (Gradwohl, Jeremy) (Entered: 04/27/2026) |
| 04/28/2026 | 21 | APPLICATION of Non-Resident Attorney Shawn Rabin to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42115157) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 22 | APPLICATION of Non-Resident Attorney Henry J. Walter to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. BCACDC-42120361) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 23 | APPLICATION of Non-Resident Attorney Natasha J. Fernndez-Silber to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42121891) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 24 | APPLICATION of Non-Resident Attorney Sarah R. LaFreniere to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450.00 Previously Paid on 4/28/2026, Receipt No. ACACDC-42121984) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 25 | APPLICATION of Non-Resident Attorney Zachary D. Caplan to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42122598) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 26 | APPLICATION of Non-Resident Attorney Julia R. McGrath to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42122746) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 27 | APPLICATION of Non-Resident Attorney Andrew C. Curley to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42122862) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 04/28/2026) |
| 04/28/2026 | 28 | ORDER by Judge John F. Walter: granting 21 Non-Resident Attorney Shawn Rabin APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/28/2026) |
| 04/28/2026 | 29 | ORDER by Judge John F. Walter: granting 22 Non-Resident Attorney Henry J. Walter APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley W. Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/28/2026) |

| | | |
|---|---|---|
| 04/28/2026 | 30 | ORDER by Judge John F. Walter: granting 23 Non-Resident Attorney Natasha J. Fernndez-Silber APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/28/2026) |
| 04/28/2026 | 31 | ORDER by Judge John F. Walter: granting 24 Non-Resident Attorney Sarah R. LaFreniere APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/28/2026) |
| 04/29/2026 | 32 | ORDER by Judge John F. Walter: granting 25 Non-Resident Attorney Zachary D. Caplan APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley W. Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/29/2026) |
| 04/29/2026 | 33 | ORDER by Judge John F. Walter: granting 26 Non-Resident Attorney Julia R. McGrath APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley W. Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/29/2026) |
| 04/29/2026 | 34 | ORDER by Judge John F. Walter: granting 27 Non-Resident Attorney Andrew C. Curley APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley W. Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 04/29/2026) |
| 04/29/2026 | 43 | Mail Returned addressed to Zachary Caplan re Pro Hac Vice Application Due 16 . (iv) (Entered: 05/04/2026) |
| 04/30/2026 | 35 | DECLARATION of Lead Trial Counsel filed by Plaintiff Malm, Inc.. (Josephs, Halley) (Entered: 04/30/2026) |
| 05/01/2026 | 36 | APPLICATION of Non-Resident Attorney William C. Carmody to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. BCACDC-42159147) filed by Plaintiff Malm, Inc. Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 05/01/2026) |
| 05/01/2026 | 37 | Notice of Appearance or Withdrawal of Counsel: for attorney Elyse Miriam Greenwald counsel for Defendants CoStar Group, Inc., Costar Realty Information, Inc.. Adding Elyse M. Greenwald as counsel of record for CoStar Group, Inc. and CoStar Realty Information, Inc. for the reason indicated in the G-123 Notice. Filed by Defendants CoStar Group, Inc. and CoStar Realty Information, Inc.. (Attorney Elyse Miriam Greenwald added to party CoStar Group, Inc.(pty:dft), Attorney Elyse Miriam Greenwald added to party Costar Realty Information, Inc.(pty:dft))(Greenwald, Elyse) (Entered: 05/01/2026) |
| 05/01/2026 | 38 | CERTIFICATION AND NOTICE of Interested Parties filed by Defendants CoStar Group, Inc., Costar Realty Information, Inc., (Greenwald, Elyse) (Entered: 05/01/2026) |
| 05/01/2026 | 39 | WAIVER OF SERVICE Returned Executed filed by plaintiff Malm, Inc.. upon CoStar Group, Inc. waiver sent by Plaintiff on 4/30/2026, answer due 6/29/2026; Costar Realty Information, Inc. waiver sent by Plaintiff on 4/30/2026, answer due 6/29/2026. Waiver of Service signed by Nicholas J. Boyle. (Josephs, Halley) (Entered: 05/01/2026) |
| 05/04/2026 | 40 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney William C. Carmody to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. BCACDC-42159147) 36 . The following error(s) was/were found: Incorrect party listed on the application. (sbou) (Entered: 05/04/2026) |

| | | |
|---|---|---|
| 05/04/2026 | 41 | Corrected APPLICATION of Non-Resident Attorney William C. Carmody to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc. (Pro Hac Vice Fee - $450.00 Previously Paid on 5/1/2026, Receipt No. BCACDC-42159147) filed by Plaintiff Malm, Inc.. (Attachments: # 1 Proposed Order) (Josephs, Halley) (Entered: 05/04/2026) |
| 05/04/2026 | 42 | ORDER by Judge John F. Walter: finding as moot 36 ; granting 41 Non-Resident Attorney William C. Carmody APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Malm, Inc., designating Halley Josephs as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 05/04/2026) |
| 05/08/2026 | 44 | OBJECTIONS to Notice of Related Case(s) 4 filed by Defendants CoStar Group, Inc., Costar Realty Information, Inc.. (Greenwald, Elyse) (Entered: 05/08/2026) |
| 05/11/2026 | 45 | DECLARATION of LEAD TRIAL COUNSEL filed by Defendants CoStar Group, Inc., Costar Realty Information, Inc.. (Greenwald, Elyse) (Entered: 05/11/2026) |
| 05/11/2026 | 46 | APPLICATION of Non-Resident Attorney Sarah A.Tomkowiak to Appear Pro Hac Vice on behalf of Defendants CoStar Group, Inc., Costar Realty Information, Inc. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42242449) filed by Defendants CoStar Group, Inc., Costar Realty Information, Inc.. (Attachments: # 1 Proposed Order) (Greenwald, Elyse) (Entered: 05/11/2026) |
| 05/12/2026 | 47 | ORDER by Judge John F. Walter: granting 46 Non-Resident Attorney Sarah A.Tomkowiak APPLICATION to Appear Pro Hac Vice on behalf of Defendants CoStar Group, Inc., Costar Realty Information, Inc., designating Elyse M. Greenwald as local counsel. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY (sbou) (Entered: 05/12/2026) |
| 05/12/2026 | 48 | DECLARATION of NEW LEAD TRIAL COUNSEL filed by Defendants CoStar Group, Inc., Costar Realty Information, Inc.. (Tomkowiak, Sarah) (Entered: 05/12/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 05/12/2026 13:35:21 | | | |
| **PACER Login:** | RitaDaleyrdaley | **Client Code:** | 25192.00000 |
| **Description:** | Docket Report | **Search Criteria:** | 2:26-cv-04052-JFW-PVC End date: 5/12/2026 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

HALLEY W. JOSEPHS (CA Bar No. 338391)
hjosephs@susmangodfrey.com
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100

WILLIAM C. CARMODY (*pro hac vice* forthcoming)
bcarmody@susmangodfrey.com
SHAWN J. RABIN (*pro hac vice* forthcoming)
srabin@susmangodfrey.com
HENRY J. WALTER (*pro hac vice* forthcoming)
hwalter@susmangodfrey.com
SUSMAN GODFREY LLP
One Manhattan West, 50th Fl.
New York, NY 10001
Phone: (212) 336-8330

*Attorneys for Plaintiff and the Proposed Class*
*(Additional Counsel Listed on Signature Page)*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

MALM, INC., individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.

*Defendants*.

Case No. 2:26-cv-04052

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PARTIES .......... 5

III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE .......... 8

IV. FACTUAL BACKGROUND .......... 10

- A. The Commercial Real Estate Industry .......... 10
- B. The Emergence of CoStar .......... 11
- C. CoStar Acquires LoopNet and Runs Out the FTC Clock .......... 13

V. THE ANTICOMPETITIVE SCHEME .......... 15

- A. CoStar Locks In Customers and Substantially Forecloses Competition Through Exclusive Agreements .......... 16
- B. CoStar Manipulates Broker-Supplied Content to Reinforce the Perception of Exclusivity .......... 20
  1. CoStar watermarks customer content. .......... 20
  2. CoStar uses "fingerprinting" to litter CRE listings with inaccurate property information. .......... 22
  3. CoStar's pattern of aggressive litigation reinforces the Scheme. .......... 24
- C. CoStar Deploys Technological Barriers to Block Competitors' Access to Listings .......... 26
- D. CoStar's Exclusionary Scheme Has Drawn Prior Antitrust Scrutiny 32

VI. ANTITRUST INJURY .......... 35

VII. THE RELEVANT MARKETS .......... 40

VIII. COSTAR'S MONOPOLY POWER IN THE RELEVANT MARKETS .......... 44

IX. COSTAR'S CONDUCT HAS NO VALID PROCOMPETITIVE JUSTIFICATION....47

X. CAUSES OF ACTION....48

XI. CLASS ACTION ALLEGATIONS....63

XII. PETITION FOR RELIEF....67

XIII. JURY DEMAND....68

Plaintiff Malm, Inc. brings this action on behalf of itself and others similarly situated against Defendants CoStar Group, Inc. and CoStar Realty Information, Inc., (collectively, "CoStar" or "Defendants") for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*; and the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*

## I. INTRODUCTION

1. This antitrust action challenges CoStar's willful acquisition and maintenance of monopoly power in the United States markets for commercial real estate ("CRE") (a) information services and (b) listing databases (collectively, "CRE information and listing services"), as defined below at ¶¶ 140-151. CoStar has wielded that power to charge supracompetitive prices to Plaintiff and the proposed Class and California Subclass—CRE brokers and professionals who have no viable alternative to CoStar's services.

2. CoStar operates the largest CRE platforms and databases in the United States. Its eponymous CoStar Platform is the dominant CRE information services database, providing data on commercial real estate properties nationwide. Its LoopNet.com (formerly known as LoopNet, Inc.) ("LoopNet") is the dominant online marketplace for listing and browsing commercial properties for sale or lease. By CoStar's own admission, "nearly 90% of all CRE activity occurs on a CoStar Network." For CRE brokers like Plaintiff—who depend on these services to list properties, search for properties, and research market conditions on behalf of clients—CoStar's platforms are not optional. As one former CoStar employee recounted: "There is only one customer at CoStar Group — [CEO Andrew Florance]. Nobody really cares about the actual customers. As one manager said to me, 'they have nowhere else to go!'" Another described the company's indifference to customer complaints: "Management doesn't care. As long as there

is no competition, they will always be able to sell. They know no one is in competition with their product, so they do not care." A third called CoStar a "monopoly that customers cannot stand doing business with."

3. CoStar achieved this dominance not through superior products or competitive pricing, but through a decades-long campaign to eliminate rivals, followed by an exclusionary scheme to ensure that no new competitor can emerge.

4. CoStar's path to dominance began with a strategy of acquiring competitors—with each, eliminating a source of competition, absorbing the former competitor's data, and expanding its own market power. Since the 1990s, CoStar has completed more than 30 acquisitions.

5. CoStar's acquisition campaign peaked in 2012 with its purchase of LoopNet—then a significant competitor in both CRE information services and listing databases. The Federal Trade Commission ("FTC") opposed the deal, concluding that it would "increas[e] the likelihood that CoStar [would] exercise market power unilaterally." The FTC permitted the acquisition only on specific conditions including that CoStar was required to divest LoopNet's majority stake in Xceligent, a smaller but growing competitor, and to refrain from undermining Xceligent's ability to compete for a fixed period.

6. CoStar did not honor the spirit of those conditions. For example, at a company event, CoStar's CEO Andrew Florance unveiled a caged gerbil he had named "Doug"—after Xceligent's CEO Doug Curry—and declared that the gerbil "would live longer than Curry would last as chief executive." Former CoStar employees independently confirmed this pattern. One wrote that the CEO "constantly sends out negative emails about the now demised Xceligent as if he gloats in their loss."

7. As soon as the FTC's behavioral restrictions expired, CoStar moved against Xceligent through aggressive litigation premised on dubious intellectual

property claims, technological blocking, and other exclusionary tactics. By 2017, Xceligent was bankrupt. Seven months later, CoStar raised prices for new customers by 80%.

8. CoStar's CEO made no effort to disguise the company's unchallenged position. On CoStar's Q3 2019 earnings call, Florance told investors that CoStar is "all alone in a multi-trillion dollar asset class" and is "not being driven by an escalating tit for tat with a bunch of head-to-head competitors." In another earnings call, he described the company's position in revealing terms; CoStar had built a "moat" around its customer base.

9. With its competitors eliminated, CoStar implemented a scheme to foreclose future competition by controlling the CRE data that any would-be rival would need to build a viable alternative platform (the "Scheme"). The Scheme has three interlocking components:

10. First, CoStar imposes contractual provisions on CRE brokers that, while nominally disavowing exclusivity, function in practice as de facto exclusive arrangements—prohibiting brokers from sharing their own CRE listings, data, and photographs with CoStar's competitors.

11. Second, CoStar reinforces these de facto exclusivity restraints by manipulating CRE-broker-supplied content in ways that convey ownership and control. CoStar affixes proprietary watermarks to photographs taken and owned by brokers and "fingerprints" listings by embedding deliberately inaccurate data. These practices allow CoStar to monitor when brokers deviate from exclusivity and share their content on rival platforms, deterring brokers from participating in competing platforms.

12. Third, CoStar deploys technological barriers—including IP-address blocking, firewalls, and automated detection systems—that prevent brokers and

competitors from accessing publicly available listing data, including in situations when the brokers who own that data have authorized the competitor to use it.

13. Together, these mechanisms lock the CRE data ecosystem and chill competition, ensuring that the information necessary to build a competing platform is exclusively within CoStar's control.

14. The anticompetitive nature of CoStar's conduct has already been recognized by the courts. In *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc.*, 150 F.4th 1056 (9th Cir. 2025), the Ninth Circuit held that a recent nascent competitor named CREXi plausibly alleged that CoStar's contractual provisions "lock brokers into exclusive agreements with CoStar," *id.* at 1074, and that CoStar "engaged in anticompetitive conduct" through de facto exclusive deals and technological barriers that "deceive[] [CoStar's] customers and protect[] its monopoly in a manner not attributable to competition on the merits," *id.* at 1075.

15. CoStar's Scheme has substantially foreclosed competition in the relevant antitrust markets and continues to do so. Plaintiff and the members of the proposed Class and California Subclass, as defined below at ¶ 264, have paid and continue to pay supracompetitive prices for CRE information and listing services —prices no firm could sustain in a competitive market—because CoStar has eliminated meaningful alternatives.

16. Plaintiff brings this action on behalf of itself and others similarly situated under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and, on behalf of itself and a California Subclass defined below, under the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* Plaintiff seeks monetary and injunctive relief to halt CoStar's ongoing violations of federal and state antitrust law, restore competition in the affected markets, and obtain redress

for the injuries it, the Class, and the California Subclass have suffered—including treble damages under federal and California law and restitution under the UCL.

## II. PARTIES

17. Plaintiff Malm, Inc., is a corporation organized under the laws of California with a principal place of business in Lafayette, California. During the Class Period defined herein, Plaintiff paid supracompetitive fees directly to Defendants for use of their CRE information services and listing database products.

18. Defendant CoStar Group, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Arlington, Virginia. CoStar Group, Inc. operates several internet real estate services, including its CRE information services database, "CoStar" (previously known as "CoStar Suite" and herein referred to as "CoStar Platform"), which it describes as the "most comprehensive proprietary database of commercial real estate information in the industry" with nationwide coverage. CoStar also operates LoopNet, its CRE listing service that CoStar describes as "our flagship brand" of online CRE listings and the "#1 global commercial real estate marketplace."

19. Defendant CoStar Realty Information, Inc. ("CoStar Realty") is a corporation organized under the laws of Delaware with its principal place of business in Arlington, Virginia. CoStar Realty Information, Inc. is a wholly owned subsidiary of CoStar Group, Inc.

20. LoopNet, Inc. was a corporation organized under the laws of California with a principal place of business in California. CoStar Group completed its acquisition of LoopNet, Inc. on or around April 30, 2012 through an Agreement and Plan of Merger dated April 27, 2011, as amended May 20, 2011. As a result of the Agreement and Plan of Merger, LoopNet became a wholly owned subsidiary of CoStar Group, Inc., retaining all of its liabilities. In December 2016,

LoopNet, Inc. merged with CoStar Realty Information, Inc. LoopNet, Inc. ceased to exist and CoStar Realty retained all of LoopNet's liabilities.

21. At all relevant times, CoStar Group, LoopNet, and CoStar Realty operated not as separate and independent corporate entities, but rather as integrated components of a single enterprise under the centralized control and direction of CoStar Group. CoStar Group exercises complete ownership and control over LoopNet and CoStar Realty, neither of which is publicly traded, independently capitalized, or separately managed from the parent company. LoopNet and CoStar Realty do not issue separate public financial statements and do not report independently to investors or regulators; instead, their revenues, expenses, operations, and liabilities are fully consolidated into CoStar Group's SEC filings.

22. CoStar Group maintains a single, centralized executive leadership team that exercises authority over all subsidiaries, including LoopNet and CoStar Realty. Neither LoopNet nor CoStar Realty have an independent board of directors or independent executive leadership. Andrew Florance, for instance, is listed as the "Founder and Chief Executive Officer of CoStar Group" whose "leading brands include CoStar, LoopNet," and others.

23. Defendants consistently hold themselves out to the public, investors, customers, and job applicants as a single company operating under the CoStar Group name, rather than as separate and distinct corporate entities. CoStar Group's official website identifies LoopNet as an internal "brand" or "product" of CoStar Group and does not disclose or emphasize their separate corporate existence. LoopNet's brand pages, marketing materials, and online presence are hosted directly on CoStar Group's website, reinforcing the appearance that LoopNet is merely a business line within CoStar Group. Defendants' public communications repeatedly use collective terms such as "we," "our company," and "CoStar Group"

when describing operations carried out by LoopNet and CoStar Realty, without distinction between the entities.

24. Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. operate as a single unit in the CRE information services industry. Through CoStar Realty Information, Inc., CoStar Group, Inc. operates the CRE information services product "CoStar" (previously known as "CoStar Suite" and herein referred to as "CoStar Platform"), which CoStar Group describes as the "most comprehensive proprietary database of commercial real estate information in the industry" with nationwide coverage. In SEC filings, CoStar Group refers to CoStar Realty Information, Inc. as its "primary operating entity in the United States." In describing the CoStar CRE information services platform in legal complaints filed by CoStar Group and CoStar Realty Information, Inc., the companies have described themselves collectively as "CoStar."

25. CoStar Group maintains a single, centralized workforce that performs services across LoopNet and CoStar Realty without regard to corporate boundaries. Positions dedicated exclusively to LoopNet operations—including sales, digital advertising, and marketplace management roles—are posted, recruited, and hired through CoStar Group's centralized careers portal. Job postings for LoopNet positions identify CoStar Group as the employer, describe CoStar Group in the "Company Overview," and make no reference to LoopNet as a separate employing entity. Employees performing work for LoopNet are subject to CoStar Group's policies and benefits plans, demonstrating that CoStar Group directly controls the labor necessary to operate LoopNet's business. Employees working on CoStar Realty data and analytics products are similarly advertised and hired by CoStar Group, subject to CoStar Group's policies and benefits plans.

## III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE

26. This case arises under the Sherman Act and the Clayton Act, and under California state antitrust and unfair competition law. Plaintiff brings claims for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; seeks treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a); and seeks injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiff and the California Subclass also bring claims under the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*, and the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*, and seek treble damages pursuant to California Business and Professions Code § 16750(a) and restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

27. This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims pursuant to 28 U.S.C. §§ 1331 (federal question), 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust), because this action arises out of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same case or controversy as the federal claims and derive from a common nucleus of operative fact. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs and at least one member of the Class is a citizen of a state different from that of each Defendant.

28. This Court has personal jurisdiction over CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "Defendants" or "CoStar") because they operate nationally, transacting business throughout the United States, including in this District (including selling CoStar Platform and LoopNet products

to CRE professionals in this District); and they are engaging in the alleged anticompetitive conduct, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Jurisdiction over Defendant CoStar Realty Information, Inc. is also proper because it is registered to do business in the State of California and has purposely availed itself of the privilege of conducting business in California.

29. CoStar Group operates offices in Los Angeles, Irvine, San Diego, and San Francisco, California. CoStar employs CoStar Data & Analytics Sales executives, including regional vice presidents, regional directors, and account and sales executives in Los Angeles and Irvine, who regularly sell CoStar Platform products to California customers, including members of the Class. CoStar employs "Security Engineers" in Irvine and San Diego, who, on information and belief, develop and administer the blocking technology alleged herein. CoStar employs LoopNet Digital Advertising sales executives and associates in Los Angeles and San Francisco that regularly sell LoopNet's advertising products to California customers, including members of the Class.

30. The Los Angeles area is one of the largest and most active regions for CRE activity in the United States. On information and belief, many CRE brokers in this District purchase CoStar Platform information services and LoopNet listing services, and Defendants' anticompetitive conduct—including the exclusive dealing arrangements, content manipulation, and technological barriers alleged herein—has directly affected CRE brokers and competition in this District.

31. Defendants have purposefully targeted California customers who market and distribute their services in this District, enter into contracts within this District, and otherwise transact business within this District. Defendants have entered into the de facto exclusive agreements alleged herein with CRE brokers

located in this District and have enforced their exclusionary contract terms and technological barriers against brokers and competitors operating in this District.

32. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because both Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District, as outlined above, and certain unlawful acts alleged herein were performed and had effects within this District (including selling CoStar Platform and LoopNet to CRE professionals in this District and entering into de facto exclusive agreements with California brokers like Plaintiff).

33. Defendants' anticompetitive actions have had a substantial effect on interstate trade and commerce. Defendants provide data, information, and images for CRE properties for sale or lease across state lines. Defendants have marketed and sold CRE information and listing services to purchasers in all U.S. states and territories. Defendants' conduct has substantial anticompetitive effects on interstate commerce, including increased prices and costs, reduced innovation and quality of service, and/or lowered output. Through their anticompetitive conduct, Defendants have excluded, or seek to exclude, competitors from the CRE information and listing services markets, and have deprived consumers of the benefits of competition among multiple providers of CRE information and listing services.

## IV. FACTUAL BACKGROUND

### A. The Commercial Real Estate Industry

34. Commercial real estate ("CRE") consists of properties used for business purposes that generate income through rental revenue or capital appreciation. These properties serve as workspaces, retail establishments, or business operations centers rather than residences.

35. CRE brokers and advisors, including Plaintiff, serve as intermediaries in transactions, assisting clients in selling, leasing, or purchasing commercial properties. These brokers rely heavily on digital platforms to efficiently market properties, locate suitable real estate, and conduct due diligence. These digital platforms perform two distinct kinds of services: (1) information services, and (2) listing services. Each type of service is described below:

36. CRE information services refers to the compilation of detailed data on commercial properties, such as addresses, asking prices, lease rates, historical transactions, building specifications, tenant rosters, floor plans, photographs, and occupancy rates. This information is often supplied to CoStar by CoStar's broker customers.

37. CRE listing databases refers to the maintenance of accessible platforms for marketing and browsing properties currently or previously available for lease or sale. Listings on these platforms are created by CRE brokers. CRE listings typically include property addresses, sizes, types (office, retail, industrial), asking prices or lease rates, photos, marketing flyers, and contact details for brokers or owners. Listing platforms serve mainly as marketplaces and generally lack extensive historical or analytical data.

38. CRE professionals often utilize and require both CRE information and listing services. These services significantly reduce brokers' search costs, expand their marketing exposure, and centralize searchable inventories and property data, thereby streamlining CRE transactions.

**B. The Emergence of CoStar**

39. CoStar, founded in 1987 by Andrew Florance, gradually built a dominant national CRE information database through acquisitions and exclusive brokerage partnerships. CoStar pursued decades of growth through acquisitions,

rolling up more than 30 companies since the 1990s to expand its coverage and consolidate its hold on CRE data.

40. By the late 1990s, CoStar was the leading provider in the United States of CRE information services.

41. Around the same time, LoopNet (then an independent company) launched a free CRE listing service wherein brokers could post and market properties, quickly gaining widespread adoption due to ease of use and public visibility. In 1999, LoopNet partnered with the National Association of Realtors ("NAR") to gain access to major brokerage listings in exchange for NAR's endorsement of LoopNet as the preferred national commercial listing service. This positioned LoopNet as the primary destination for publicly marketed CRE listings, prompting many brokerages to abandon internal systems in favor of LoopNet, which became the *de facto* system of record. LoopNet later introduced LoopLink, a tool enabling companies to embed LoopNet-managed listings on their own websites, offering brokers a simple method to display available CRE listings online.

42. By the 2000s, LoopNet was integral to the CRE industry—not only for public marketing but also for managing active inventory through embedded tools like LoopLink. Around the same time, another player emerged: Xceligent developed CRE information and listing service platform products that competed with CoStar Platform. Xceligent rapidly expanded in major metropolitan areas across the United States. LoopNet became a majority preferred stockholder in Xceligent through investments in 2007 and 2009.

43. During this time, CoStar initiated multiple lawsuits against LoopNet over copyright infringement, unauthorized data access, and false advertising. Although these disputes financially strained LoopNet, it continued to offer free public access to all CRE listings on its listings platform.

**C. CoStar Acquires LoopNet and Runs Out the FTC Clock**

44. In 2012, CoStar acquired LoopNet for approximately $860 million, consolidating the nation's leading CRE listing database (LoopNet) and information service (CoStar) under one company. LoopNet at the time was also the majority shareholder of the preferred stock of Xceligent, which competed with CoStar in CRE information services.

45. When CoStar announced its agreement to acquire LoopNet in 2011, the FTC opposed the deal, finding it would eliminate competition between CoStar and its then-closest competitors, LoopNet and Xceligent. The FTC considered Xceligent to be "a significant competitor to CoStar in the [metropolitan] areas where it is present, and the closest competitive alternative to CoStar for many U.S. CRE listings database and information services customers." LoopNet, at the time, was also the majority owner of Xceligent and separately operated the largest and most heavily trafficked CRE listings database, with 4.8 million registered members, over 6 million unique quarterly visitors, and listings covering roughly 27 million properties.

46. To secure the FTC's approval of the LoopNet acquisition, CoStar entered into a consent order, requiring CoStar to divest LoopNet's stake in Xceligent and agree to a variety of "conduct relief" measures (which are unusual in a merger agreement) aimed at preserving Xceligent as an independent competitor, facilitating its growth, lowering barriers to entry, and preventing foreclosure of Xceligent's access to existing customers.

47. The consent order, issued on August 29, 2012, imposed conduct restrictions for a period of five years and appointed a third-party monitor to ensure compliance. Among other things, the consent order prohibited CoStar from restricting customers from sharing CRE data with competitors, conditioning the sale of one product on the purchase of another, requiring customers to purchase

products covering multiple geographies, and penalizing customers who subscribed to competing services. The consent order further required CoStar, if it bundled its products on new platforms, to continue offering all existing products separately at commercially reasonable prices. The consent order's conduct provisions expired in August 2017.

48. The consent order's customer notices expressly informed CoStar's customers that CoStar "may not require you to subscribe to one of CoStar's products as a condition to subscribing to another CoStar product" and "may not require you to subscribe to products covering one or several geographic areas as a condition to subscribing to products covering other geographic areas." CoStar was further required, if it bundled its products together on new platforms, to "continue to offer the products separately for about 3 years at commercially reasonable prices."

49. CoStar did not take its commitments to the FTC seriously, even from the outset. According to Xceligent's former CEO, while the CoStar-LoopNet merger was still undergoing FTC review, CoStar told Xceligent customers it was going to buy Xceligent, shut it down, and increase prices, coercing customers to subscribe to CoStar immediately to avoid paying higher rates after the merger closed.

50. CoStar completed its acquisition of LoopNet on or around April 30, 2012 and divested its interests in Xceligent shortly thereafter. CoStar acquired LoopNet in part to eliminate a competing product that undercut CoStar on price. The acquisition eliminated head-to-head rivalry with LoopNet, a key competitor that many in the industry viewed as CoStar's last serious threat, and gave CoStar access to vast amounts of broker-contributed data.

51. With the five years of protection provided by the FTC consent order, Xceligent successfully expanded its coverage from 36 metropolitan areas to 53

metropolitan areas and its workforce from 160 to over 1,300 between 2012 and 2016. In 2016, Xceligent kicked off extensive business development efforts in the New York tri-state region, CoStar's most lucrative market. Xceligent was at CoStar's front door and expanding rapidly.

52. However, once the consent order's protections expired in 2017, CoStar proceeded to engage in the very practices the FTC consent order was designed to prevent, driving Xceligent out of business and cementing CoStar's dominance in the CRE industry.

## V. THE ANTICOMPETITIVE SCHEME

53. Determined not to let any actual or potential competitor in the CRE information and listing services markets compete on the merits, CoStar has engaged in a multifaceted, self-enforcing anticompetitive Scheme. The Scheme has three interlocking components: (1) de facto exclusive contracts with brokers that prohibit them from sharing their own CRE listings, data, and photographs with CoStar's competitors; (2) manipulation of broker-supplied content through watermarking and fingerprinting that conveys CoStar's ownership, deters sharing with rival platforms, and allows CoStar to monitor and enforce exclusivity; and (3) technological barriers that prevent brokers and competitors from accessing publicly available listing data, including in situations when the brokers who own that data have authorized the competitor to use it.

54. Because CoStar has largely eliminated rival platforms through an aggressive roll-up campaign and the anticompetitive Scheme described herein, brokers increasingly rely on CoStar for their livelihoods. CoStar has exploited this dynamic to tie up brokers' CRE information and CRE listings, making it virtually impossible for its broker-customers to share their own CRE information and listings with CoStar's platform competitors, who need this same data to compete with CoStar. The resulting negative feedback loop is self-enforcing: Brokers

cannot share data with competitors; competitors therefore cannot build platforms of sufficient scope and scale; and brokers, lacking any viable alternative, remain locked into CoStar's ecosystem at whatever price CoStar dictates.

### A. CoStar Locks In Customers and Substantially Forecloses Competition Through Exclusive Agreements

55. CoStar imposes exclusive agreements on CRE brokers who use the CoStar Platform that coerce them into exclusively using CoStar's CRE information and listing services. Specifically, CoStar conditions access to its dominant services—including the CoStar Platform and LoopNet—on customers' agreement to non-negotiable Terms and Conditions that prohibit customers from sharing their own listings, data, and photographs with CoStar's competitors. By prohibiting brokers from sharing such information with competing platforms, these terms prevent brokers from working with competitors and deny competitors access to necessary information and data, resulting in substantial foreclosure of competition.

56. The CoStar License Agreement Terms and Conditions dated April 5, 2021 provide that brokers (defined as the "Licensee") "shall not distribute, disclose, copy, reproduce, make available, communicate to the public by telecommunication, display, publish, transmit, assign, sublicense, transfer, provide access to, use or sell, directly or indirectly, any portion of the Licensed Product." The Terms and Conditions further provide that Licensee shall not "upload, post or otherwise transmit any portion of the Licensed Product on, or provide access to any portion of the Licensed Product through, the Internet, any bulletin board system, any electronic network, any listing service or any other data sharing arrangement" accessible to anyone beyond the broker and its authorized users. The Terms also provide that Licensees "shall not" "access or use the Licensed Product if Licensee is a direct or indirect competitor of CoStar or provide any portion of the Licensed Product to any direct or indirect competitor of CoStar."

57. CoStar's Terms and Conditions define "Licensed Product" broadly to include all "information, text, . . . photographic and other images and data contained in" CoStar's "database of commercial real estate . . . industry information." This definition encompasses a broker's own listings shared with CoStar and posted onto its platforms, as well as any photographs, descriptions, and other information contained in those listings. These terms also expressly state that "under no circumstances" can any "photographs from the Licensed Product that depict properties that Licensee owns, controls, represents or holds exclusives . . . be posted on any website that may compete with the Licensed Product."

58. In other words, once a broker has put their own listings, photographs, and other information on CoStar's platform, the broker is prohibited from sharing any of this information with a competing service. Although CoStar's Terms nominally acknowledge that brokers "retain [their] rights" to information and images they provide to CoStar, in practice, because brokers use CoStar's platform as their system of record for maintaining and updating listings, they inevitably access and share content "from the Licensed Product"— triggering the restrictions described above. LoopNet's Advertising Agreement Terms and Conditions impose nearly identical prohibitions on data sharing.

59. Together, these exclusive data dealing agreements prevent brokers from listing properties across multiple services, require brokers to exclusively use CoStar, and deny competitors access to information and data necessary to compete in the relevant market. As the Ninth Circuit explained in its recent decision reviving CREXi's antitrust claims against CoStar, "in practice, [the contracts] require brokers to exclusively use CoStar's services," and "condition access … on an agreement not to support or share equivalent data with CoStar's competitors." *CREXi*, 150 F.4th at 1074.

60. By design, CoStar's contractual restrictions and related conduct deter broker participation in alternative CRE information and listing services, increase switching costs out of the CoStar ecosystem, and suppress the emergence of viable competitors. Brokers have confirmed these effects. When approached by CREXi about posting their listings on a competing platform, brokers consistently declined, citing their contractual obligations to CoStar. One broker explained that she could not allow CREXi to post her listings because "that would be some sort of breach of contract with [CoStar]." Another broker explained that he could not work with CREXi because it would "conflict with our National CoStar agreement." A third broker told CREXi that listing his properties on multiple services would be "problematic in regard to [his] contractual relationship with CoStar." These accounts confirm the practical exclusionary effect of CoStar's contract terms—brokers who provide data to CoStar are, in practice, foreclosed from also providing that data to CoStar's competitors.

61. As discussed more fully below, CoStar further strengthens its exclusive control over broker-supplied content by placing proprietary watermarks on photographs uploaded to the CoStar platform and deliberately embedding inaccurate data into listing information, providing a mechanism for CoStar to monitor and enforce the exclusivity.

62. Given CoStar's dominant position, brokers have little choice but to accept these exclusive agreements and input their data into CoStar's ecosystem.

63. The exclusionary effects of these contracts are bolstered by their long-term nature. Most CoStar and LoopNet licensing agreements have one- to three-year terms and auto-renew unless terminated with significant advance notice. CoStar maintains punitive cancellation rules that bind customers to fixed-term agreements that automatically renew unless the customer gives lengthy advance notice to avoid the renewal. Many CoStar users are caught off guard when they

learn they cannot cancel their contracts. Numerous customers have publicly complained about these practices on review sites and message boards. Likewise, brokers have told CREXi that CoStar's cancellation policies have prevented them from working with CREXi.

64. CoStar's exclusive dealing agreements have locked in its customers and prevented potential competitors from competing in the markets for CRE information and listing services. Given CoStar's market share of over 90% in each of these markets, these exclusive dealing arrangements have foreclosed competition in a substantial share of the market for CRE information and listing services.

65. CoStar's exclusive dealing agreements, and their actual or threatened enforcement, have the practical effect of foreclosing any would-be CoStar competitor from obtaining the information needed to create a robust CRE listing and information services and have thereby enabled CoStar to acquire and maintain monopoly power in the markets for CRE information and listing services, harming competition and resulting in supracompetitive prices and a reduction of quality—precisely the harms the antitrust laws were designed to protect against.

66. Participation in CoStar, LoopNet, and/or LoopLink combined with Defendants' exclusionary agreements ties brokers to the CoStar ecosystem while effectively locking them out of all other potential platforms. One broker relayed this dynamic to a representative of CREXi in explaining why she could not work with CREXi:

> Unfortunately our listings are on the [brokerage] website via Looplink. I do not keep lists of our listings on excel or other platforms as we have over 300 listings that change daily, and I don't have the extra time to keep track on multiple platforms. I can't think of an alternative way to get you [my brokerage]'s listings at this time.

67. Because CoStar conditions access to its products on brokers' agreements not to support or share equivalent data with CoStar's competitors, it effectively requires brokers to exclusively use CoStar's services to list properties.

68. Through these practices, CoStar locks in its exclusive access to broker-generated content, raises rivals' costs, and deters brokers from working with competitors, thereby foreclosing competition in the CRE information and listing services markets, as broker content is crucial to any market participant's ability to compete by offering access to a wide array of CRE properties.

### B. CoStar Manipulates Broker-Supplied Content to Reinforce the Perception of Exclusivity

69. Once CRE professionals submit listing content to LoopNet or CoStar Platform, CoStar manipulates that content to ensure adherence to the exclusivity. CoStar does this through at least two practices—watermarking and fingerprinting—which both convey CoStar's ownership and control over the broker-supplied content. These tactics serve a dual purpose: they chill broker participation on competing platforms and equip CoStar with a means to detect and punish any broker who attempts to list content elsewhere.

#### 1. CoStar watermarks customer content.

70. CoStar routinely places its own watermark on uploaded photographs, even for photographs over which CoStar does not own the copyright, such as when a broker supplies CoStar with the broker's own or privately commissioned photographs.

71. By affixing its watermark to broker-owned photographs, CoStar claims the broker-submitted content as its own and reinforces the *de facto* exclusivity required under its contracts. The watermarks allow CoStar to easily monitor and detect when brokers breach the exclusivity and share their content with rival platforms. Brokers are then deterred from freely using or distributing

their own photographs, including to competing platforms, in fear of retaliation from CoStar.

72. The photos below are instances where a broker privately paid for photos to be taken of their listing, uploaded their photographs to LoopNet without watermarks, and CoStar later altered the image to add its watermark in the bottom right corner of the photograph:

**<u>Broker Supplied Image</u>** **<u>CoStar Watermarked Image</u>**













73. Because CoStar does not notify brokers of these modifications, brokers risk inadvertently violating CoStar's contractual terms by reusing content they created; as the reuse of broker-submitted content, now altered without their

awareness, constitutes a breach of contract under CoStar's terms.

74. For example, evidence produced in the *CREXi* litigation shows that in August 2020, a broker complained to CoStar about CoStar's watermarking of the broker's renderings, which "caused them to be blocked on other sites." In response, a CoStar sales executive acknowledged that the materials were part of the broker's listing, and that CoStar added the watermark to prevent "further distribution of *your* photographs." A LoopNet Vice President of Operations added: "If we add watermarks to all photos on our site, it is to ensure others don't scrape our data and *use photos from our site on other sites*." Other evidence suggests that CoStar watermarks "all" images "once they are in our database," including "user uploaded images."

75. Some brokers even add their own watermarks to photos uploaded to LoopNet in an effort to avoid CoStar's baseless copyright claims, but CoStar has gone as far as cropping out the broker watermark and adding the CoStar watermark.

76. By applying its watermark to photographs over which brokers retain ownership, CoStar reinforces the perception (among brokers and rival platforms) that broker-supplied content belongs exclusively to CoStar. Even when brokers may have rights to reuse their own information, the threat of detection, enforcement, or retaliation discourages them from participating in competing services—further entrenching CoStar's *de facto* exclusive arrangements.

**2. CoStar uses "fingerprinting" to litter CRE listings with inaccurate property information.**

77. CoStar also unilaterally modifies brokers' listings and data in ways that further enable it to monitor and enforce compliance with the exclusive arrangements and deter brokers from sharing their own content with competitors.

78. CoStar's contractual terms purport to grant CoStar the right to unilaterally adjust, or "fingerprint," property listing information supplied by

brokers. CoStar has admitted that it "inserts bits of fictitious data within the property records that appear within the CoStar Service," such as a building's parking ratio, lot size, the year it was built, etc.—a practice CoStar calls "seeding" or "salting" listings. Indeed, CoStar has stated in prior litigation filings that its CoStar database contains certain "seed listings," which include fictitious information.

79. CoStar's own employees have confirmed that the company's database contains widespread inaccuracies — both deliberate and systemic. One former CoStar employee described spending months "trying to quietly clean up blatantly inaccurate data that we had been selling to subscribers for years." Another employee stated that "most associates would input false information just to keep up numbers and refrain from being put on a performance improvement plan." A third stated bluntly: "Data is fake, quotas are enforced so hard people make things up to keep their jobs."

80. CoStar uses software to detect the appearance of its altered data on a competitor's platform. When CoStar identifies its fictitious data on a rival service, it treats that as evidence of misappropriation, which instills fear among brokers that any data shared with a competitor will be traced back to CoStar and used as a basis for enforcement action—further entrenching CoStar's *de facto* exclusive arrangements.

81. By altering brokers' own data without their knowledge, CoStar creates a trap. Brokers often pull their own data from CoStar's platform, intending to use information they previously contributed for marketing outside of CoStar. Because CoStar has covertly altered that data, brokers inadvertently supply inaccurate information to CoStar's competitors—and are then "caught" by CoStar's detection software and threatened with copyright or contractual claims. The result is that brokers avoid competitors altogether out of fear and confusion.

82. CoStar's fingerprinting also directly harms brokers by causing them to rely on inaccurate data when valuing properties or creating marketing materials, or by forcing brokers to independently verify the accuracy of information they themselves originally entered but that CoStar has surreptitiously manipulated.

**3. CoStar's pattern of aggressive litigation reinforces the Scheme.**

83. CoStar, known to be "famously litigious," frequently threatens and brings lawsuits against its customers and its competitors premised on claims of copyright ownership and breach of contract. These lawsuits reinforce the perception among brokers that they cannot share their own content with competing platforms without risking costly legal action.

84. Between 2004 and 2016, CoStar filed over 30 federal lawsuits against both competitors and its own customers. Since 2015, CoStar has filed at least 37 different lawsuits, often alleging copyright infringement, intellectual property theft, and breach of contract. These lawsuits are frequently aimed at emerging or smaller rivals in the CRE information and listing services markets. CBRE's (one of CoStar's biggest customers) former head of global innovation said, CoStar "used litigation to suppress innovation in the space" and "over time, they have cultivated an adversarial approach to customers."

85. On information and belief, the purpose and effect of CoStar's litigation campaign is to instill fear in broker-customers, who rely on CoStar for their livelihoods, so that they will not risk working with rivals offering better prices or products. CoStar's watermarking and fingerprinting practices compound this effect by making it easier for CoStar to detect and punish brokers that share their own broker-created content with rival platforms. This chills competition by deterring brokers from using competitor platforms to post listings, share images or CRE information even when they themselves took the photos or gathered the

information.

86. Brokers' fear of reprisal from working with CoStar competitors is well-founded. For instance, in 2021, CoStar sued Leon Capital (a customer) for allegedly violating CoStar's Terms of Use. CoStar later accused Leon Capital of being a "competitor" to CoStar—and thus barred from obtaining CoStar's services under its Terms of Service pursuant to the provision that prohibits competitors from accessing CoStar's services—because the CEO of Leon Capital was an advisor to and promoted competing information and listing services platform provider CREXi. CoStar terminated Leon Capital's account but nonetheless sought damages for its remaining contract under its supposed "acceleration" clause. Such lawsuits are meant to have a chilling effect on any customer that may work with a CoStar competitor, and make clear that any claim by CoStar of a lack of exclusivity is illusory.

87. CoStar's rivals have also recognized the intimidating intent of CoStar's litigiousness. In 2014, CoStar sued CompStak, a crowdsourced CRE data startup. CompStak's CEO said there was "no doubt in [his] mind" that CoStar launched the suit simply to intimidate him. "It was all about scare tactics." "The point was not about copyright. The point was trying to smear CompStak in the press." Similarly, competing information and listing services platform provider CREXi has decried the intellectual property claims that CoStar asserted against it as an intimidation tactic: "CoStar's false claims of intellectual property ownership, combined with its aggressive litigiousness, foster a market environment where brokers are deterred from sharing their own CRE property information with competitors like CREXi."

### C. CoStar Deploys Technological Barriers to Block Competitors' Access to Listings

88. To further ensure brokers are prevented from working with competitors and providing CRE listings or CRE information to competitors, CoStar employs technological mechanisms to block competitors from accessing LoopNet, which is generally available to the public, as well as brokers' own LoopLink-enabled websites—even where brokers have provided permission to the competitor to access the brokers' own websites, photos, and listing information.

89. CoStar uses what it euphemistically calls an "abuse monitor" to block competitors from accessing CoStar Platform or LoopNet by blocking their internet protocol (IP) addresses—despite the content being publicly available and broker-owned. If CoStar's "abuse monitor" determines that a competitor is attempting to access CoStar Platform or LoopNet, CoStar temporarily blocks the competitor's IP address so that the user sees an "Error and Abuse" notice like the one shown below:



90. CoStar also employs firewalls to permanently block IP addresses associated with competitors and prevent them from accessing CoStar Platform or LoopNet, causing them to immediately receive the below error message when they try to go to the free, public LoopNet home page:




91. Blocking competitors from accessing the CoStar Platform and LoopNet websites is not enough, however, because CoStar also employs blocking technology to prevent competitors from accessing CRE listings on *brokers' own websites* that use CoStar's LoopLink tool. CoStar employs this blocking technology on brokers' own websites without informing the broker. Thus, brokers will grant CoStar competitors permission to access *their own* CRE listings available on *their own* website, but the competitor will be denied access when they go to access the broker's website—information that, again, is available to the general public. For example, a blocked competitor would encounter the following "Access Denied" message when it is locked out of the broker's publicly available website:




92. Competitors are thus prevented from accessing live CRE listings on these brokers' own websites, even when they have the broker's permission. This is particularly notable since CoStar relies on its own access to brokers' websites to obtain the same CRE listings and data.

93. In lawsuits brought by CoStar, two CoStar competitors, CREXi and Xceligent, filed antitrust counterclaims against CoStar for, among other things, imposing this blocking technology that prevents their access to otherwise publicly available broker websites.

94. CREXi identified multiple examples of brokers expressing frustration that they were unable to share information about *their own* CRE listings displayed on *their own* websites using LoopLink. One broker told CREXi: "I'm not sure why you can't access these [listings] because they are on our own website."

95. Ironically, CoStar now employs this blocking technology in a manner that it derided as anticompetitive when it was deployed by LoopNet against CoStar while they were still competitors (before CoStar's 2012 acquisition of LoopNet).

96. Prior to CoStar's acquisition of LoopNet, LoopNet sued CoStar to block CoStar's access to its publicly available CRE listings. Andrew Florance, CoStar's CEO, explained in a 2008 Declaration regarding the litigation that CoStar needs to access CRE listings and information available on LoopNet in order to remain competitive:

> CoStar researchers obtain the most complete and up-to-date information about commercial real estate in a variety of ways…In some cases, our researchers find out about listings by asking the broker a series of questions about the property in question. In other cases, the broker themselves have already written up a description of the property. In the latter cases, commercial brokers often direct CoStar researchers to take their listings from the brokers' own websites or email their listings to CoStar. Because brokers make money when their properties are sold or leased, they are naturally eager to obtain the maximum possible exposure for their listings. CoStar has long employed these techniques both for listings that have no connection to LoopNet and for listings representing brokers that, as discussed below, have paid LoopNet to host the listing portion of the broker's website.

Florance also described the measures employed by LoopNet to block competitor access to their website as "outrageous."

97. CoStar and LoopNet settled their 2008 claims by agreeing both entities could access and use the publicly available information on their websites. Shortly thereafter, CoStar adopted a written policy referred to as the "Third Party Websites Policy" explicitly permitting their employees to access and use CRE Information from brokers' websites, as well as LoopNet:

> The following activities . . . are not prohibited by [CoStar's] Third Party Websites Policy: (a) viewing a broker's publicly-available website that is powered through the LoopLink™ service, (b) clicking on a hyperlink that a broker sends via email, and (c) viewing

> the public areas of the LoopNet Website, such as where press releases and product description information is made available.

98. Two years later, LoopNet again sued CoStar for copying CRE Information from LoopNet's website. CoStar again responded that it was "not doing anything wrong" by accessing public CRE Listing Information on LoopNet. CoStar explained, "we think it's silly that LoopNet makes this listing information available on its public Web site for all of the world to see, and that they're trying to essentially argue that CoStar can't look at it." CoStar's CEO, Andrew Florance, explained in a 2009 declaration that "CoStar has openly and notoriously accessed information on the non-password protected areas of LoopNet's website," "made use of that information for competitive purposes," and that it was "CoStar's right to update its database from broker websites or from listings on the LoopNet website to which brokers had directed CoStar by email."

99. In that same declaration, Florance testified that LoopNet "has been preventing CoStar's researchers from obtaining listing information provided to them by third party brokers from the non-password protected areas of LoopNet.com and *from the broker's own websites*," even though "[t]hese brokers have typically given CoStar explicit permission to obtain such information." Florance further testified that LoopNet "acknowledges that those listings belong to the broker, not LoopNet. Yet LoopNet has been preventing those brokers from sharing them with CoStar." Declaration of Andrew C. Florance, *LoopNet, Inc. v. CoStar Group, Inc.*, Case No. BC380863 (L.A. Sup. Ct. Apr. 7, 2009), ¶¶ 30-31. Florance's testimony confirms that CoStar's CEO understood—and stated under penalty of perjury—that blocking a competitor from accessing broker-owned listings on publicly available websites causes competitive harm and interferes with brokers' ability to share their own data.

100. In an earlier declaration, Florance detailed the escalating blocking campaign LoopNet deployed against CoStar in February and March 2009, testifying that LoopNet repeatedly blocked and re-blocked CoStar's access to publicly available listings—including on brokers' own LoopLink-enabled websites—despite CoStar's attempts to circumvent the blocks using different IP addresses. Florance testified that at the time of the blocking, "only approximately 25 people were engaged in conducting manual searches of the publicly-available non-password protected portions of LoopNet's website" on behalf of brokers who had directed CoStar to their own websites. Declaration of Andrew C. Florance, *LoopNet, Inc. v. CoStar Group, Inc.*, Case No. BC380863 (L.A. Sup. Ct. Mar. 10, 2009), ¶¶ 20-30. CoStar now deploys this same blocking technology—but on a far larger and more systematic scale—against its own competitors.

101. Brokers are harmed when CoStar employs this blocking technology because they have to engage in a much more time-consuming, manual process to maintain their CRE listings and keep them updated across multiple platforms. When CoStar faced blocking by LoopNet, CoStar itself sought injunctive relief because of the irreparable harm it said the blocking technology was causing:

> [B]rokers often respond to CoStar's inquiries by referring CoStar researchers to the public parts of LoopNet's website or to their own sites hosted on LoopLink…Instead of simply visiting a broker's own website or viewing the listing the broker uploaded to LoopNet and linked to CoStar, CoStar's researchers must either obtain the details of a listing over the phone or trouble the broker to send the listing in a form that is not blocked by LoopNet's denial of access. These processes slow down CoStar's research process, meaning that fewer listings are updated on a daily basis.

102. Competing CRE listing services are also harmed by the blocking technology that CoStar employs because the additional work to maintain and update CRE listings means that brokers are deterred from working with competing CRE listing services. CoStar's CEO Andrew Florance acknowledged the

anticompetitive harm resulting from LoopNet's use of similar blocking techniques pre-acquisition, explaining that "LoopNet's conduct of blocking CoStar's access to its website and/or broker websites supported by LoopNet's LoopLink technology has interfered with the performance of CoStar's customers under their license agreements" and "makes it less likely that other prospective customers will enter into economic relationships with CoStar."

**D. CoStar's Exclusionary Scheme Has Drawn Prior Antitrust Scrutiny**

103. The destruction of Xceligent and CoStar's ongoing campaign against CREXi illustrate how the three components of CoStar's anticompetitive scheme operate together to eliminate or neutralize competitors.

104. **Xceligent.** As the FTC consent order expired in 2017, CoStar deployed the scheme against Xceligent.

105. First, CoStar's exclusionary contract terms prevented brokers from sharing their own CRE listings and data with Xceligent, depriving Xceligent of the broker-supplied content it needed to build a competitive platform—even as Xceligent was expanding into new markets and actively courting broker participation.

106. Second, CoStar's watermarking and fingerprinting practices reinforced the perception among brokers that their content could not be shared with Xceligent, further chilling broker participation on Xceligent's platform.

107. Third, CoStar deployed technological blocking tools that prevented Xceligent from accessing brokers' public listings on LoopNet and other platforms. CoStar also turned to litigation, reportedly spending tens of millions litigating against Xceligent and seeking hundreds of millions in damages. CoStar publicly disparaged Xceligent to customers, Congress, and the press, intimidating potential clients and damaging Xceligent's reputation. Former employees confirmed this campaign. One wrote that the CEO "constantly sends out negative emails about the

now demised Xceligent as if he gloats in their loss" and described the CEO as regularly sending "inappropriate emails to the entire company — i.e. who we should vote for, products we should buy, mocking companies he's put out of business."

108. As part of that litigation, Xceligent counterclaimed, accusing CoStar of anticompetitive practices, including exclusionary contracts and aggressive litigation aimed at blocking competition. Before any court could reach a decision on the counterclaims, Xceligent filed for Chapter 7 bankruptcy in 2017 and ceased operations. As a condition of CoStar's settlement with the Xceligent bankruptcy trustee, Xceligent agreed to dismiss its antitrust counterclaims—ensuring that CoStar's conduct was never adjudicated on the merits.

109. **CREXi.** With Xceligent eliminated, CoStar turned the same playbook on CREXi, an innovative CRE marketplace and technology platform founded in 2015 that had begun making competitive inroads in the CRE information services market.

110. CoStar deployed each component of its scheme against CREXi. CoStar's exclusionary contracts and technological blocking prevented brokers from sharing their own listings with CREXi, even when brokers directed CREXi to access listings on the brokers' own websites. CoStar filed suit against CREXi in 2020, alleging copyright violations, DMCA claims, and breach of contract—many premised on photographs that were, in reality, owned by brokers or third parties. CoStar's watermarking of broker-owned photographs that appeared on CREXi's platform contributed to the removal of listings and disrupted CREXi's relationships with its customers.

111. CoStar's anticompetitive intent toward CREXi was made explicit in internal communications. In February 2020, a senior LoopNet executive wrote to CoStar's CEO Andrew Florance warning that CREXi was spreading "[l]ike the

Coronavirus" and urging CoStar to act "before it gets too wide spread … Or worse, too late to stop." The executive vowed "to destroy" CREXi, and Mr. Florance responded: "You go Joe. Fight like a son of a bitch who will never die."

112. CREXi filed antitrust counterclaims, and the Ninth Circuit allowed those claims to proceed, finding that CREXi had plausibly alleged that CoStar holds monopoly power and engaged in exclusionary conduct through exclusive agreements and technological barriers. *CREXi*, 150 F.4th at 1075.

113. **CoStar's Resulting Market Position.** CoStar deploys its Scheme not to protect legitimate business interests, but to deprive would-be rivals of the broker-supplied data they need to compete, and then to litigate them into submission or insolvency.

114. With Xceligent bankrupt and CREXi embattled, CoStar faces no meaningful competitive constraint. For example, seven months after Xceligent filed for bankruptcy, CoStar raised the average price it charged new customers by 80%, from $255 to $466 per month. CoStar employees independently confirmed the connection between competitor elimination and price increases. One sales employee wrote that CoStar "increased our pricing 200-400% over the past year or two — with a huge increase when our main ex-competitor, Xceligent [went under]." Another stated: How many companies show loyalty to their oldest clients by increasing pricing on clients that have been with us for decades 500%+?" CoStar also eliminated all geographic and product-level options, forcing every customer into a single global subscription at a substantially higher price.

115. On CoStar's Q2 2020 earnings call, Florance candidly explained why CoStar's business was more resilient than during the 2008 recession: "in the great recession we had two super low cost competitors, so we're competing against a very well-funded Xceligent . . . charging probably 15%-20% of what we charge for a service . . . . We also were competing against LoopNet at that time it was

offering a product at 5% of the cost of our product. So those two things are no longer a factor." In other words, CoStar's CEO told investors that the elimination of competitors—through acquisition and forced bankruptcy—allowed CoStar to maintain prices that would have been unsustainable in a competitive market.

116. As of 2025, CoStar's market capitalization is approximately $35 billion, with quarterly revenues exceeding $700 million and strong profit margins.

117. The effectiveness of CoStar's scheme is reflected in CoStar's ability to maintain a renewal rate above 90% (*i.e.*, more than 90% of existing subscribers resubscribe with the CoStar Platform each year) despite rising costs and decreased quality—a hallmark not of customer satisfaction, but of market power unchecked by competition.

## VI. ANTITRUST INJURY

118. Since its acquisition of LoopNet in 2012, CoStar has raised listing prices by as much as 300% to 500% and also systematically raised prices for its CRE information services, including by eliminating lower-cost alternatives and forcing brokers onto its higher-priced CoStar Platform.

119. Until 2017, LoopNet directly competed with CoStar's information services. Its flagship product, "Premium Searcher," let brokers—paying a monthly subscription—view both paid and free listings on LoopNet. LoopNet also offered lower-priced tools: "Property Facts," which provided ownership, lender, tenant, market statistics, and tax data for active and off-market properties; and "Property Comps," which supplied sale price, buyer, seller, and sale date data for closed transactions. Brokers could subscribe to any combination of these products, tailoring cost to need.

120. In October 2017, after its takeover of LoopNet, CoStar eliminated all three LoopNet information products—Premium Searcher, Property Facts, and Property Comps—forcing brokers seeking similar data into CoStar's own, higher-

priced CoStar Platform. CoStar later boasted that LoopNet users who had been paying $0–$145 per month were converted into CoStar Platform subscribers paying an average of $520 per month.

121. CoStar's CEO later celebrated this conversion on earnings calls, noting that CoStar's "best quarter of net new business generation ever" was "27% higher than the first quarter 2018 when we sunsetted LoopNet Premium Searcher"—directly linking the elimination of the lower-cost LoopNet product to CoStar's sales performance.

122. At the same time, CoStar made LoopNet's CRE database services less accessible and more expensive. It discontinued LoopNet's unlimited listing plans — which had allowed brokerage firms to post "a huge number of listings" for only a few dollars each — and replaced them with tiered advertising plans priced between $220 and $1,054 per month to have properties appear on LoopNet's free, public-facing site.

123. CoStar also sharply reduced the share of LoopNet listings brokers could view for free or low cost, locking access behind a subscription to the CoStar Platform. CoStar touted the results, reporting that brokers previously paying $54 per month for LoopNet were converted into CoStar Platform subscribers paying between $473 and $555 per month.

124. Until its bankruptcy in December 2017, Xceligent also continued to compete with CoStar on CRE information services. According to Xceligent's former CEO, Xceligent's prices were, on average for its full product, approximately 40% lower than CoStar's.

125. After eliminating competition from Xceligent and less expensive alternative products, CoStar engaged in a campaign in 2018 to ensure what it referred to as 'strong and consistent pricing integrity" with customers. In reality, CoStar substantially raised prices for its CRE information services and eliminated

discounting programs (including bundled discounts, manager discretionary discounts, and partial product sale discounts). CoStar boasted that this resulted in an 80% increase in the average price per new broker user license, from $255 to $466 per month.

126. Around 2019, CoStar began instituting larger annual price increases on its CoStar Platform. Where CoStar had historically imposed average annual increases of approximately 3%, it began imposing average annual increases of 6–7%.

127. Around the same time, CoStar also imposed steep advertising price hikes on LoopNet via tiered packages (Silver, Gold, Platinum, Diamond). CoStar capped the number of ads available in each tier. Brokers were pressured to upgrade to more costly tiers to maintain comparable visibility, with limited Diamond slots creating artificial scarcity and enabling premium pricing. Brokers described the system as coercive, with "sold-out" tiers funneling customers into high-cost packages. By 2020, customers paid an average of $710 per month for a single listing and, by 2021, an average of $984 per month per listing.

128. With the COVID pandemic significantly affecting the CRE business starting in 2020, CoStar, for the first time ever, paused its annual price increases from approximately March 2020 through August 2021. But beginning in September 2021, CoStar reinstituted its annual price increases.

129. For 30 years, CoStar offered CoStar Platform subscriptions with a range of geographic options (local, regional, state, national, or global) and allowed brokers to choose among three distinct types of information service products (property information, comparable sales information, and tenant information). By 2021, with no competitive threat to rein it in, CoStar eliminated all of these options. Starting July 1, 2021, CoStar discontinued every CoStar Platform product other than a single global subscription—rebranded simply as "CoStar"—that bundled all

information services across all geographies at a substantially higher price, regardless of whether a broker's business extended beyond a single market. Customers, on average, were forced to pay an additional $200 per month, with customers that had previously subscribed to local, regional, or state products seeing significantly larger increases. For context, as of 2017, the CoStar regional product sold for approximately $695 per month and the state product for approximately $995 per month; the national product sold for approximately $1,395 per month. By 2021, the only option available was the global product, priced even higher than the former national product. CoStar itself historically organized its sales around more than 100 distinct local and regional markets, as reflected in the geographic market definitions set forth in the FTC consent order's appendices. CoStar's elimination of all geographic options thus abandoned not only its own longstanding product structure, but also the consumer protections the FTC had specifically imposed to prevent precisely this kind of forced bundling.

130. At the time CoStar announced this consolidation, only 17% of its customers subscribed to the most comprehensive offering—meaning that the vast majority of customers were forced into a more expensive product they had not previously chosen to purchase.

131. CoStar has continued to enforce this mandatory global subscription structure throughout the Class Period, requiring all new and renewing subscribers to purchase the bundled global product at prices that have continued to increase annually. By 2025, brokers reported paying as much as $1,700 per month per user for the CoStar Platform. Brokers report instances of having to pay $6,000 to obtain information data for a single customer because they no longer have the option to purchase services for one local region.

132. Throughout the Class Period, CoStar imposed annual price increases on CoStar Platform subscribers. On CoStar's second quarter 2022 earnings call,

CoStar's CEO confirmed that CoStar was pushing pricing increases through its sales force at renewals. On information and belief, CoStar imposed annual price increases on its CoStar Platform subscribers in each year from 2022 through 2025, averaging approximately 5% to 8% annually, compounding the already-supracompetitive pricing described above.

133. During the Class Period, CoStar continued to lock brokers into auto-renewing annual contracts at supracompetitive prices. CoStar typically requires 60 days' advance notice to cancel. If brokers miss the 60-day cancellation window, they are automatically renewed at then-current rates—which reflect the cumulative effect of CoStar's successive price increases—and are locked into another year-long contract. Brokers who failed to provide timely notice of cancellation were thus forced to continue paying supracompetitive prices for an additional year, with no meaningful alternative to which they could switch.

134. CoStar's double-digit revenue growth throughout the Class Period was sustained, in substantial part, by these ongoing price increases imposed on a captive customer base. CoStar's revenue from its CoStar Platform product grew approximately 15–17% in 2022, 10–11% in 2023, and approximately 10% in 2024. CoStar repeatedly described its products as "mission critical" to its customers—an acknowledgment that CRE professionals have no viable alternative—and reported contract renewal rates of 90% or higher in every quarter throughout the Class Period, including renewal rates of 96% to 98% among customers subscribed for five years or longer.

135. CRE professionals now have no choice but to buy the full global CoStar Platform subscription to compete for customers and cannot turn to a competitor product without, among other things, being threatened with lawsuits.

136. CoStar has also degraded product quality. In recent years, customers have reported significant usability issues, widespread technical glitches, and

unresponsive support. One customer reported that "the program glitches more than you would hope" and that "the representatives are super slow in responding to your emails." A customer on Trustpilot described CoStar's "customer service" as "atrocious," stating: "They overpromise, underdeliver." Another customer reported that "CoStar has the worst customer service I have ever experienced. They take months to respond, lie to get you into contract and then do not deliver on the services promised."

137. As CoStar has eliminated virtually all competition in the market for CRE information services, CoStar has invested less in its researchers, so the quality of CoStar's data has declined while prices continue to increase.

138. CoStar's anticompetitive scheme—including its exclusive dealing arrangements, manipulation of broker-supplied content, and deployment of technological barriers—has remained in full effect throughout the Class Period and continues to the present. Each supracompetitive payment made by Plaintiff and Class members during the Class Period constitutes a new and independent injury caused by CoStar's ongoing anticompetitive conduct.

139. The supracompetitive prices and degraded quality described above are a direct and proximate result of CoStar's anticompetitive scheme. But for CoStar's exclusionary contracts, content manipulation practices, and technological barriers, competitors would have entered or expanded in the CRE information and listing services markets, exerted downward pressure on prices, and offered brokers meaningful alternatives. Instead, CoStar's scheme has foreclosed competition, leaving Plaintiff and the Classes with no choice but to pay inflated prices for inferior services.

## VII. THE RELEVANT MARKETS

140. CoStar possesses monopoly power in two distinct but related markets: (a) the market for CRE information services and (b) the market for CRE listing

databases. The FTC recognized these as distinct relevant lines of commerce in connection with CoStar's acquisition of LoopNet, identifying "(a) CRE listings databases; and (b) CRE information services" as relevant product markets.

141. CRE information services involve the compilation of information containing property-level information about commercial real estate gathered and made available primarily to enable users to locate, research, or evaluate commercial real estate. CRE information includes, but is not limited to, commercial real estate addresses, the prices at which property has been offered for lease or sale, the prices at which comparable property has been offered, leased or sold in the past, lease histories, property descriptions, detailed floor plans, photographs, tenant history, and vacancy rates. Such information enables brokers to advise clients effectively, compete for listings, and make informed decisions.

142. CoStar dominates the CRE information services market through its CoStar Platform, which it markets as an industry-leading source of commercial real estate information, analytics, and news. While some CRE data is publicly available from government or industry sources, it would be inefficient for individual brokers to aggregate, verify, and analyze this information independently, as they lack the analytical tools offered by a comprehensive CRE information service. No other service provides a reasonable substitute at scale.

143. The demand for CoStar's information services is inelastic. When CoStar implements a small but significant and non-transitory increase in price ("SSNIP") for these platforms, customers do not switch to alternatives in sufficient numbers to make the increase unprofitable. Indeed, CoStar has implemented numerous significant price increases on its CoStar Platform over the last eight years, yet it has continued to steadily increase its volume of subscribers and has maintained a renewal rate above 90%—meaning more than 90% of existing subscribers resubscribe with the CoStar Platform each year. CoStar's ability to

charge and sustain supracompetitive prices in the CRE information services market confirms that it constitutes a distinct, relevant product market under antitrust law.

144. CRE listing databases involve disseminating information concerning commercial real estate available for lease or for sale, gathered and displayed on digital platforms that brokers use to market properties and that prospective tenants and buyers use to search for available space. CRE listings include, but are not limited to, commercial real estate addresses, price information, square footage, photographs, narrative descriptions of the property, and broker contact information. Listing platforms may have national or regional scope, but comprehensive geographic coverage is generally expected.

145. CoStar, through its LoopNet platform, is the dominant national provider of CRE listing databases. LoopNet is marketed as the primary destination for commercial space discovery and is part of CoStar's global network. While some LoopNet features are publicly accessible, brokers subscribe to paid services for premium features such as enhanced marketing, branding, and search rankings.

146. CRE professionals rely on CRE listing services for both tenant/buyer and owner/landlord representation. These services are more efficient and cost-effective than general-purpose digital marketplaces (*e.g.*, Craigslist or Facebook Marketplace) or non-digital methods like on-site signage or print advertising, which lack targeted CRE audiences and sufficient listing density.

147. Non-digital and general-purpose digital advertising options are not reasonable substitutes for CRE listing services. When CoStar raises prices for LoopNet listing services by a SSNIP, users do not switch to other platforms or methods at sufficient scale to render the price increase unprofitable. Indeed, CoStar has implemented numerous significant price increases for listing properties on LoopNet over the last eight years, yet it has continued to see a steady increase in the volume of listings advertised on LoopNet. CoStar's ability to charge and

maintain supracompetitive prices for LoopNet listing services confirms that CRE listing services constitute a separate, relevant product market.

148. CRE information services and CRE listing services are complementary. A critical mass of listings is a necessary input for generating high-quality market reports, sales and lease comps, and other analytics. Market power in listing services bolsters market power in information services by depriving rivals of the data needed to compete. Yet the markets are distinct: customers can and do buy one without the other, and CoStar charges separately for each. The fact that CoStar can charge supracompetitive prices in both markets confirms that neither constrains the other—and that both are relevant product markets for purposes of antitrust analysis.

149. The relevant geographic market for both CRE information services and CRE listing databases is the United States. CoStar markets and sells its services nationwide, and its databases and platforms contain property information from across the country. Brokers often subscribe to the CoStar Platform and LoopNet. Since at least 2021, CoStar no longer offers subscriptions limited to regional or local areas, effectively making its products national in scope.

150. Alternatively, the smallest plausible geographic market is a metropolitan area, *i.e.*, a Metropolitan Statistical Area, which is defined by the U.S. Census Bureau as:

> A geographic entity delineated by the Office of Management and Budget for use by federal statistical agencies. Metropolitan statistical areas consist of the county or counties (or equivalent entities) associated with at least one urbanized area of at least 50,000 population, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties.

151. In either geographic market (the United States or metropolitan areas), CoStar maintains dominant shares and enforces exclusionary policies that protect its monopoly power.

## VIII. COSTAR'S MONOPOLY POWER IN THE RELEVANT MARKETS

152. At all relevant times, CoStar has possessed—and continues to possess—monopoly power in the markets for CRE information and listing services in the United States. CoStar has had the power to raise prices to supracompetitive levels and maintain those prices profitably without losing substantial business. That power is sustained by CoStar's anticompetitive conduct, along with high barriers to entry and switching costs, which deter rivals and lock in customers.

153. In each of the distinct markets for CRE information services and CRE listing services, CoStar's market share exceeds 90%. Its flagship products—the CoStar Platform and LoopNet—are dominant in their respective verticals, and both are widely regarded as essential by CRE professionals. Approximately 45% of CoStar's $1.5 billion in annual revenue derives from CRE information services alone.

154. There is direct and circumstantial evidence of CoStar's monopoly power. CoStar boasts that "nearly 90% of all CRE activity occurs on a CoStar Network" and has claimed that LoopNet drives "18X more activity than [its] nearest competitor." Financial analysts confirm that LoopNet's share of traffic is multiples above any other CRE listing platform. One former CoStar executive estimated that 95% of CRE brokers in the U.S. subscribe to the CoStar Platform.

155. These figures are consistent with CoStar's reported high renewal rates. CoStar's own earnings disclosures confirm its monopoly power. CoStar has reported 90% overall contract renewal rates and 95% renewal rates among long-term subscribers in every quarter from 2019 through 2025, despite implementing

successive rounds of significant price increases throughout that period. CoStar also repeatedly characterizes its products as “mission critical” to its customers—an acknowledgment that CRE professionals cannot operate their businesses without CoStar’s services and have no viable alternative.

156. CoStar charges prices far above competitive levels, and its customers keep paying despite widespread frustration. The marginal cost of providing another user access to the CoStar Platform or LoopNet is near zero, yet CoStar charges thousands of dollars per user per year.

157. As detailed above, CoStar has repeatedly and substantially raised prices following the elimination of competitors—including increases of up to 300-500% on listing prices and an 80% increase in average CRE information services prices for new customers and successive annual increases thereafter—without meaningful customer defections. These price increases, sustained over years, are direct evidence of monopoly power.

158. A small but significant and non-transitory increase in CoStar’s prices would not cause a significant number of users to switch to alternatives because no comparable alternative exists at scale.

159. High barriers to entry and switching costs further entrench CoStar’s monopoly power. The CRE information and listing services markets are characterized by strong network effects: an increase in brokers who use a particular information or listing service increases the value of that service to other brokers, creating a self-reinforcing cycle that benefits incumbents and impedes new entrants. Brokers cannot afford to go without CoStar’s data and visibility, and listings posted to LoopNet gain the most exposure, reinforcing CoStar’s control over the data inputs necessary to compete in information and listing services. Brokers also rely on CoStar’s accumulated data and analytics, which cannot easily be replicated or

exported to a new platform. CoStar reinforces these barriers through exclusionary agreements, manipulation of broker-supplied content, and technological blocking.

160. But for CoStar's exclusionary conduct, rivals could have entered or expanded, eroding CoStar's market share and pricing power. Customers would have had more choices, lower prices, and better services.

161. Industry participants recognize that CoStar is a monopolist. CoStar's customers recognize that CoStar imposes drastic price hikes at will, that such price increases occur despite a decline in the quality of CoStar's products, and that they are nonetheless left without any alternative options in the CRE information and listing services markets:

a. CoStar employee: "This is what an American monopoly looks like[.]"
b. CoStar employee: "You have a monopoly and you act like it."
c. CoStar employee: "Clients don't like you, but have no choice but to use you."
d. CoStar employee: "No one is motivated because company is a clear monopoly."
e. CoStar employee: "This place will survive b/c it's a MONOPOLY."
f. CoStar customer: "No idea how loopnet / costar gets away with what they do as an extremely litigious attempt at a monopoly that feels more like extortion than a service every time you pay them."
g. CoStar employee: "The company is basically a monopoly in the industry, which stunts any actual growth or need to improve"
h. CoStar customer: "Too bad CoStar is nearly impossible to compete with… could really use some (accurate) competition in the CRE data space."

i. CRE industry commentator: "It feels like software from the Windows 95 era, but because it holds the monopoly on data, they have zero incentive to modernize the UI."

j. CoStar customer: "We only have so many dollars to spend and costar/loopnet eats up a large part of that. Like everyone else we would like to see a good alternative to costar but at this point I don't think we are prepared to cut the cord."

k. CoStar customer: "After our rent, it's CoStar. This is probably true for most companies."

l. The President of the CCIM Institute, a leading CRE professional organization, following Xceligent's bankruptcy: "It certainly opens up the opportunity for abuse any time there's a single player."

## IX. COSTAR'S CONDUCT HAS NO VALID PROCOMPETITIVE JUSTIFICATION

162. CoStar's exclusionary behavior across the CRE information and listing services markets lacks any valid procompetitive justification. Its actions are designed to insulate its market position, foreclose rivals, and limit customer choice—not to improve product quality, innovation, or efficiency.

163. CoStar's contractual restrictions do not protect legitimate intellectual property interests. The vast majority of the CRE listings, photographs, and data that CoStar claims as proprietary were supplied by CoStar's own broker-customers. CoStar adds little to no value to this content, yet uses its contractual terms to prevent brokers from sharing their own content with competing platforms. Blocking brokers from distributing their own listings serves no purpose other than to deny rivals the data inputs they need to compete.

164. CoStar's technological barriers likewise serve no procompetitive purpose. Blocking competitors—and only competitors—from accessing publicly

available listings on brokers' own websites does not protect CoStar's innovation or investment. It protects CoStar's monopoly. CoStar's own prior conduct confirms this: before acquiring LoopNet, CoStar openly argued that public CRE listings should be freely accessible to competitors, litigated to protect that principle, and adopted internal policies reflecting it. CoStar reversed course only after it acquired LoopNet and had the market power to exclude rivals.

165. CoStar's aggressive assertion of intellectual property rights over broker-owned content is similarly unjustified. CoStar routinely watermarks photographs it does not own and fingerprints listings with fictitious data. These practices are not grounded in any legitimate business need—they are designed to create the false impression that broker-supplied content is exclusively CoStar's property, thereby reinforcing CoStar's de facto exclusive arrangements and deterring brokers from sharing their own content with competing platforms.

166. To the extent CoStar asserts any procompetitive justification for its conduct, any such justification is pretextual and could be achieved through substantially less restrictive means that do not foreclose competition.

## X. CAUSES OF ACTION

### COUNT ONE

### Exclusive Dealing in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 CRE Information Services

167. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

168. To the extent it is necessary to define the relevant markets, CRE information services in the United States is a relevant antitrust market.

169. At all relevant times, CoStar's exclusive dealing arrangements have foreclosed competition in a substantial share of the relevant market. CoStar's

monopoly power in the CRE information services market as alleged herein confirms the substantiality of that foreclosure.

170. As more fully alleged above, CoStar has entered into express and/or *de facto* exclusive dealing agreements with customers including contractual restrictions that in practice lock CRE professionals into exclusive relationships with CoStar, which unreasonably restrained trade in the CRE information services market.

171. CoStar's conduct affects a substantial volume of interstate commerce.

172. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced choice, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or has sought to exclude, competitors from the CRE information services market and has deprived consumers of the benefits of competition among multiple providers of these services.

173. CoStar's exclusive dealing arrangements have substantially foreclosed competition in the market for CRE information services because those agreements cover the market for CRE information services in which CoStar holds monopoly power.

174. Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative CRE information services, as well as more options and lower prices for such services, including the products offered by competitors, such as CREXi and Xceligent.

175. CoStar's exclusive dealing arrangements lack a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

176. To the extent any such procompetitive justification exists, CoStar could have achieved it through less restrictive means.

177. As a direct, material, and proximate result of CoStar's violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining CoStar's conduct.

178. Plaintiff and the Class seek treble damages for CoStar's violations of § 1 under § 4 of the Clayton Act.

179. Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT TWO
## Exclusive Dealing in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 CRE Listing Databases

180. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

181. To the extent it is necessary to define the relevant markets, CRE listing databases in the United States is a relevant antitrust market.

182. At all relevant times, CoStar's exclusive dealing arrangements have foreclosed competition in a substantial share of the relevant market. CoStar's monopoly power in the CRE listing databases market — as alleged herein — confirms the substantiality of that foreclosure.

183. As more fully alleged above, CoStar has entered into express and/or *de facto* exclusive dealing agreements with customers including contractual restrictions that in practice lock CRE professionals into exclusive relationships

with CoStar, which unreasonably restrained trade in the CRE listing databases market.

184. CoStar's conduct affects a substantial volume of interstate commerce.

185. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced choice, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or has sought to exclude, competitors from the CRE listing databases market and has deprived consumers of the benefits of competition among multiple providers of these services.

186. CoStar's exclusive dealing arrangements have substantially foreclosed competition in the market for CRE listing databases because those agreements cover the market for CRE listing databases in which CoStar holds monopoly power.

187. Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative CRE listing databases, as well as more options and lower prices for such services, including the products offered by competitors.

188. CoStar's exclusive dealing arrangements lack a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

189. To the extent any such procompetitive justification exists, CoStar could have achieved it through less restrictive means.

190. As a direct, material, and proximate result of CoStar's violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and

face an ongoing threat of new injuries absent an injunction restraining CoStar's conduct.

191. Plaintiff and the Class seek treble damages for CoStar's violations of § 1 under § 4 of the Clayton Act.

192. Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**COUNT THREE**

**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**CRE Information Services**

193. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

194. To the extent it is necessary to define the relevant markets, CRE information services in the United States is a relevant antitrust market.

195. CoStar's conduct constitutes the intentional and unlawful maintenance of monopoly power in the CRE information services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

196. At all relevant times, CoStar possessed monopoly power in the relevant market. CoStar possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

197. Barriers to entry and barriers to expansion by existing firms are high in the CRE information services market.

198. CoStar unlawfully maintains its monopoly power in the CRE information services market through the anticompetitive scheme described herein, including by: (a) imposing exclusionary contractual provisions that in practice lock brokers into exclusive relationships with CoStar by prohibiting them from sharing their own CRE listings, data, and photographs with CoStar's rivals; (b) manipulating broker-supplied content through watermarking and fingerprinting to

reinforce the perception among brokers that their own listings and data are now exclusively CoStar's, deterring brokers from sharing their own content with competing platforms; and (c) deploying technological barriers that surreptitiously block competitors from accessing brokers' own publicly available listings.

199. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

200. CoStar's conduct affects a substantial volume of interstate commerce.

201. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced choice, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the CRE information services market and has deprived consumers of the benefits of competition among multiple providers of CRE information services.

202. CoStar's conduct has substantially foreclosed competition in the market for CRE information services because it has monopoly power in the market for CRE information services and its exclusionary conduct affects all brokers using CoStar Platform.

203. CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon CRE information services that it sells to customers that could result in reduced prices, higher quality, greater choice, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the CRE information services market. CoStar's anticompetitive conduct reduces competition, which only serves to further cement

CoStar's monopoly while disadvantaging consumers and competition on the merits.

204. Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative CRE information services, and lower prices for such services.

205. As a direct, material, and proximate result of CoStar's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining CoStar's conduct.

206. Plaintiff and the Class seek treble damages for CoStar's violations of § 2 under § 4 of the Clayton Act.

207. Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT FOUR

**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**CRE Listing Databases**

208. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

209. To the extent it is necessary to define the relevant markets, CRE listing databases in the United States is a relevant antitrust market.

210. CoStar's conduct constitutes the intentional and unlawful maintenance of monopoly power in the CRE listing databases market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

211. At all relevant times, CoStar possessed monopoly power in the relevant market. CoStar possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

212. Barriers to entry and barriers to expansion by existing firms are high in the CRE listing databases market.

213. CoStar unlawfully maintains its monopoly power in the CRE listing databases market through the anticompetitive scheme described herein, including by: (a) imposing exclusionary contractual provisions that in practice lock brokers into exclusive relationships with CoStar by prohibiting them from sharing their own CRE listings, data, and photographs with CoStar's rivals; (b) manipulating broker-supplied content through watermarking and fingerprinting to reinforce the perception among brokers that their own listings and data are now exclusively CoStar's, deterring brokers from sharing their own content with competing platforms; and (c) deploying technological barriers that surreptitiously block competitors from accessing brokers' own publicly available listings.

214. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

215. CoStar's conduct affects a substantial volume of interstate commerce.

216. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced choice, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the CRE listing databases market and has deprived consumers of the benefits of competition among multiple providers of CRE listing services.

217. CoStar's conduct has substantially foreclosed competition in the market for CRE listing databases because it has monopoly power in the market for

CRE listing databases and its exclusionary conduct affects all brokers using LoopNet.

218. CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon CRE listing services that it sells to customers that could result in reduced prices, higher quality, greater choice, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the CRE listing databases market. The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

219. Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative CRE listing databases and lower prices for such services.

220. As a direct, material, and proximate result of CoStar's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining CoStar's conduct.

221. Plaintiff and the Class seek treble damages for CoStar's violations of § 2 under § 4 of the Clayton Act.

222. Plaintiff and the Class seek an injunction against CoStar, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT FIVE
### Unreasonable Restraints of Trade
### California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*
### CRE Information Services

223. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

224. To the extent it is necessary to define the relevant markets, CRE information services in the United States is a relevant antitrust market.

225. CoStar has engaged in combinations and arrangements with its customers, including through the exclusive dealing arrangements described herein, that restrain trade and commerce in the CRE information services market, in violation of California Business and Professions Code § 16720.

226. At all relevant times, CoStar possessed monopoly power in the relevant market. CoStar possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

227. Barriers to entry and barriers to expansion by existing firms are high in the CRE information services market.

228. CoStar unlawfully restrained trade in the CRE information services market through the anticompetitive scheme described herein, including by: (a) imposing exclusionary contractual provisions that in practice lock brokers into exclusive relationships with CoStar by prohibiting them from sharing their own CRE listings, data, and photographs with CoStar's rivals; (b) manipulating broker-supplied content through watermarking and fingerprinting to reinforce the perception among brokers that their own listings and data are now exclusively CoStar's, deterring brokers from sharing their own content with competing platforms; and (c) deploying technological barriers that surreptitiously block competitors from accessing brokers' own publicly available listings.

229. CoStar committed such anticompetitive acts in California and against California residents.

230. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

231. CoStar sold its products to California residents, and CoStar's conduct affects a substantial volume of interstate and intrastate commerce in California.

232. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced choice, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the CRE information services market and has deprived consumers of the benefits of competition among multiple providers of CRE information services.

233. CoStar's conduct has substantially foreclosed competition in the market for CRE information services because it has monopoly power in the market for CRE information services and its exclusionary conduct affects all brokers using the CoStar Platform.

234. CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon CRE information services that it sells to customers that could result in reduced prices, higher quality, greater choice, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the CRE information services market. CoStar's anticompetitive conduct reduces competition, which only serves to further cement

CoStar's monopoly while disadvantaging consumers and competition on the merits.

235. Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative CRE information services, as well as more options and lower prices for such services.

236. As a direct, material, and proximate result of CoStar's violations of the Cartwright Act, Plaintiff and the California Subclass have suffered injury to their business and property throughout the Class Period, including measurable damages in an amount to be calculated at trial.

237. Plaintiff and the California Subclass seek treble damages pursuant to California Business and Professions Code § 16750(a).

238. Plaintiff and the California Subclass seek injunctive relief pursuant to California Business and Professions Code § 16750(a), preventing and restraining the violations alleged above.

**COUNT SIX**
**Unreasonable Restraints of Trade**
**California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.***
**CRE Listing Databases**

239. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

240. To the extent it is necessary to define the relevant markets, CRE listing databases in the United States is a relevant antitrust market.

241. CoStar has engaged in combinations and arrangements with its customers — including through the exclusive dealing arrangements described herein — that restrain trade and commerce in the CRE listing databases market, in violation of California Business and Professions Code § 16720.

242. At all relevant times, CoStar possessed monopoly power in the relevant market. CoStar possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

243. Barriers to entry and barriers to expansion by existing firms are high in the CRE listing databases market.

244. CoStar unlawfully restrained trade in the CRE listing databases market through the anticompetitive scheme described herein, including by: (a) imposing exclusionary contractual provisions that in practice lock brokers into exclusive relationships with CoStar by prohibiting them from sharing their own CRE listings, data, and photographs with CoStar's rivals; (b) manipulating broker-supplied content through watermarking and fingerprinting to reinforce the perception among brokers that their own listings and data are now exclusively CoStar's, deterring brokers from sharing their own content with competing platforms; and (c) deploying technological barriers that surreptitiously block competitors from accessing brokers' own publicly available listings.

245. CoStar committed such anticompetitive acts in California and against California residents.

246. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

247. CoStar sold its products to California residents, and CoStar's conduct affects a substantial volume of interstate and intrastate commerce in California.

248. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced choice, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the CRE listing databases market

and has deprived consumers of the benefits of competition among multiple providers of CRE listing services.

249. CoStar's conduct has substantially foreclosed competition in the market for CRE listing databases because it has monopoly power in the market for CRE listing databases and its exclusionary conduct affects all brokers using LoopNet.

250. CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon CRE listing services that it sells to customers that could result in reduced prices, higher quality, greater choice, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the CRE listing databases market. The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

251. Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative CRE listing databases, as well as more options and lower prices for such services.

252. As a direct, material, and proximate result of CoStar's violations of the Cartwright Act, Plaintiff and the California Subclass have suffered injury to their business and property throughout the Class Period, including measurable damages in an amount to be calculated at trial.

253. Plaintiff and the California Subclass seek treble damages pursuant to California Business and Professions Code § 16750(a).

254. Plaintiff and the California Subclass seek injunctive relief pursuant to California Business and Professions Code § 16750(a), preventing and restraining the violations alleged above.

**COUNT SEVEN**
**Unfair and Unlawful Business Practices**
**California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**CRE Information Services and CRE Listing Databases**

255. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

256. CoStar has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code § 17200 *et seq.* (the "UCL").

257. CoStar's conduct is unlawful within the meaning of the UCL because it violates Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 2 of the Sherman Act, 15 U.S.C. § 2; and the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*, as alleged in Counts One through Six above.

258. CoStar's conduct is independently unfair within the meaning of the UCL because the anticompetitive harm caused by CoStar's conduct—including supracompetitive pricing, exclusion of competitors, reduced innovation, and diminished choice in the markets for CRE information and listing services—substantially outweighs any utility of that conduct. CoStar's practice of imposing exclusionary contractual provisions, manipulating broker-supplied content to reinforce the perception of exclusivity, and deploying technological barriers to block competitors offends established public policy favoring free and open competition, as embodied in the Sherman Act, the Cartwright Act, and the common law. The harm CoStar's conduct inflicts on competition and consumers is substantial, is not outweighed by any countervailing benefits to consumers or

competition, and could not reasonably have been avoided by Plaintiff or the California Subclass given CoStar's monopoly power in both of the relevant markets.

259. CoStar's conduct affects a substantial volume of commerce in California.

260. CoStar's unfair and unlawful business practices have caused and continue to cause Plaintiff and the California Subclass to suffer injury in fact, including the payment of supracompetitive prices for CRE information and listing services that they would not have paid absent CoStar's anticompetitive conduct, and the loss of money or property within the meaning of California Business and Professions Code § 17204.

261. As a direct and proximate result of CoStar's unfair and unlawful business practices, CoStar has been unjustly enriched at the expense of Plaintiff and the California Subclass. Plaintiff and the California Subclass are entitled to restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits that CoStar obtained as a result of its unfair and unlawful business practices, pursuant to California Business and Professions Code § 17203.

262. Plaintiff and the California Subclass seek an order enjoining CoStar from continuing to engage in the unfair and unlawful business practices described herein, pursuant to California Business and Professions Code § 17203.

263. Plaintiff and the California Subclass further seek all other relief available under the UCL, including attorneys' fees and costs, including pursuant to California Code of Civil Procedure § 1021.5.

## XI. CLASS ACTION ALLEGATIONS

264. Plaintiff brings this action on behalf of itself and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as

representatives of a Nationwide Class and a California Subclass (together, the "Classes"), which are defined as follows:

> **Nationwide Class** (Counts One through Four): All persons and entities in the United States and its territories that directly paid Defendants for use of their CRE information and/or listing services products at any time during the period starting on April 14, 2022 through and until Defendants' alleged unlawful conduct and its anticompetitive effects cease (the "Class Period").

> **California Subclass** (Counts Five through Seven): All members of the Nationwide Class who, during the Class Period, resided in or maintained their principal place of business in the State of California.

Excluded from the Classes are Defendants; Defendants' officers, directors, and employees; Defendants' parents, subsidiaries, and affiliates; any co-conspirators; federal and state governmental entities; and any judges or justices assigned to hear any aspect of this action.

265. CoStar charges all customers based on the same rate card—a uniform pricing structure that CoStar applies across its customer base. Because all Class members are subject to the same pricing methodology, the overcharge resulting from CoStar's anticompetitive conduct can be measured on a classwide basis. The California Subclass is subject to the same uniform pricing methodology and the same contractual terms as all other Class members, making the California Subclass claims suitable for classwide resolution.

266. Each of the Classes is so numerous that joinder of all members in this action is impracticable. There are tens of thousands of members in the Nationwide Class, and thousands of members in the California Subclass.

267. Plaintiff's claims are typical of those of the Classes because Plaintiff presses the same legal theories, and seeks to redress the same injury, for itself as

for all members of the Classes. Plaintiff, as a California-based entity that purchased Defendants' CRE information and listing services during the Class Period, has claims typical of the Nationwide Class and California Subclass.

268. Plaintiff and all members of the Classes were all injured by the same unlawful conduct, which resulted in all of them paying more for CRE information and listing services than they otherwise would have in a competitive market.

269. Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are not antagonistic to the Classes.

270. Questions of law and fact common to the members of each of the Classes will predominate over questions, if any, that may be specific to individual members, because Defendants have acted and refused to act on grounds generally applicable to the Classes.

271. Questions of law and fact common to the Classes include, but are not limited to:

a. whether CRE information and listing services represent relevant antitrust markets.
b. whether CoStar possesses monopoly power in the relevant markets for CRE information and listing services;
c. whether CoStar willfully acquired or maintained that power through exclusionary conduct, including anticompetitive acquisitions, de facto exclusive dealing arrangements, manipulation of broker-supplied content to reinforce the perception that brokers cannot share their own data with competitors, technological barriers imposed on its own customers, and aggressive litigation to enforce its scheme;
d. whether CoStar's conduct had the effect of suppressing or eliminating competition in the relevant markets for CRE information and listing services;

e. whether CoStar's conduct resulted in supracompetitive pricing, or reduced output, innovation, or quality;

f. the appropriate measure of damages incurred by the Classes;

g. whether CoStar's conduct constitutes unreasonable restraints of trade in violation of the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*;

h. whether CoStar's conduct constitutes unfair or unlawful business practices in violation of the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*;

i. whether members of the California Subclass suffered injury in fact and lost money or property as a result of CoStar's unfair and unlawful business practices; and

j. the appropriate measure of restitution and disgorgement owed to the California Subclass.

272. Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

273. Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. The California Subclass claims raise no unique manageability concerns, as they arise from the same conduct, the same contracts, and the same pricing structure as

the Nationwide Class claims, and California law will apply uniformly to all California Subclass members.

## XII. PETITION FOR RELIEF

274. Plaintiff petitions for the following relief:

a. A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, with a Nationwide Class and a California Subclass as defined herein; that Plaintiff be appointed class representative of the nationwide Class; that Plaintiff be appointed class representative of the California Subclass; and that Plaintiff's counsel be appointed as class counsel;

b. A determination that the conduct set forth herein is unlawful under Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, under the rule of reason or any other applicable mode of analysis;

c. A determination that the conduct set forth herein constitutes unreasonable restraints of trade in violation of the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*;

d. A determination that the conduct set forth herein constitutes unfair and unlawful business practices in violation of the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*;

e. An award of treble damages to Plaintiff and the nationwide Class in an amount to be proven at trial, as authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15;

f. An award of treble damages to Plaintiff and the California Subclass in an amount to be proven at trial, as authorized by California Business and Professions Code § 16750(a);

g. Restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants as a result of their unfair and unlawful business practices, for the benefit of Plaintiff and the California Subclass, pursuant to California Business and Professions Code § 17203;

h. A judgment enjoining Defendants from engaging in further unlawful conduct, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, California Business and Professions Code § 16750(a), and California Business and Professions Code § 17203;

i. An award of attorneys' fees and costs, including pursuant to California Code of Civil Procedure § 1021.5; California Business and Professions Code § 16750(a); and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26;

j. An award of pre- and post-judgment interest on all amounts awarded; and

k. Such other relief as the Court deems just and equitable.

## XIII. JURY DEMAND

275. Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Date: April 15, 2026 Respectfully submitted,

*<u>/s/ Halley W. Josephs</u>*

HALLEY W. JOSEPHS (CA Bar No. 338391)
hjosephs@susmangodfrey.com
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100

WILLIAM C. CARMODY (*pro hac vice* forthcoming)
bcarmody@susmangodfrey.com
SHAWN J. RABIN (*pro hac vice* forthcoming)
srabin@susmangodfrey.com
HENRY J. WALTER (*pro hac vice* forthcoming)
hwalter@susmangodfrey.com
SUSMAN GODFREY LLP
One Manhattan West, 50th Fl.
New York, NY 10001
Phone: (212) 336-8330

ANDREW C. CURLEY (*pro hac vice* forthcoming)
acurley@bergermontague.com
ZACHARY D. CAPLAN (*pro hac vice* forthcoming)
zcaplan@bergermontague.com
JULIA MCGRATH (*pro hac vice* forthcoming)
jmcgrath@bergermontague.com
JEREMY GRADWOHL (CA Bar No. 344828)
jgradwohl@bergermontague.com
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000

NATASHA J. FERNÁNDEZ-SILBER (*pro hac vice* forthcoming)
nfernandezsilber@edelson.com
EDELSON PC
200 South 1st Street
Ann Arbor, MI 48104
Tel: (312) 589-6370
Fax: (312) 589-6378

SARAH R. LAFRENIERE (*pro hac vice* forthcoming)
slafreniere@edelson.com
BRANDON BAUM-ZEPEDA* (CA Bar No. 352698)
bbaum-zepeda@edelson.com
EDELSON PC
1255 Union Street NE, Suite 850
Washington, DC 20002

Tel: (202) 270-4777
*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3)